# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MANITOWOC MARINE GROUP, LLC,

        Plaintiff,

    v.                                    Case No. 03-C-0232

AMERON INTERNATIONAL CORP., *et al.*,

        Defendants.

## DECISION AND ORDER

This case arises out of the construction of a combination oil tank barge and tug boat by Manitowoc Marine Group, LLC, (Manitowoc) for Vessel Management Services, Inc. (VMS), a wholly owed subsidiary of Crowley Maritime Corporation. The contract between Manitowoc and VMS called for the application of Amercoat 253, an epoxy coating manufactured by Ameron International, on the inside of the cargo tanks on the barge. Manitowoc contracted with International Marine & Industrial Applicators, Inc. (IMIA), to apply the coating. Shortly after delivery of the tug and barge to VMS, the epoxy coating began to delaminate and had to be replaced. Manitowoc hired IMIA to re-apply the coating and then brought this action against VMS for the balance due on its contract and against Ameron and IMIA for the additional expenses it incurred as a result of the coating failure. VMS and the other defendants filed counterclaims against Manitowoc and cross-claims against each other. The citizenship of the parties being diverse, this court has jurisdiction under 28 U.S.C. § 1332.

VMS is no longer a party to the case, and Manitowoc and IMIA have settled their claims against each other. What remains are Manitowoc's claims against Ameron for breach of express and implied warranties, IMIA's cross-claim against Ameron for fraudulent suppression, and Ameron's counterclaims against Manitowoc for breach of contract and unjust enrichment. Ameron has now moved for summary judgment on all the claims against it. For the following reasons, Ameron's motion will be granted but only in part. Summary judgment will be granted on IMIA's claim against Ameron for fraud. In all other respects, however, Ameron's motion will be denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue

2

of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

With these principles in mind, I now turn to the facts of the case.

## FACTS

In March 2001, Manitowoc and VMS began negotiating an agreement pursuant to which Manitowoc would construct a combination oil tank barge and tug unit for VMS at Manitowoc's shipyard in Sturgeon Bay, Wisconsin. (Ameron PFOF ¶ 3; Manitowoc PFOF ¶ 4.) VMS had previously purchased two such units from a company known as Friede, Goldman, Halter, Inc. (Halter), but due to Halter's financial difficulties VMS had decided to look for a new builder. (O'Hern Dep. at 87:19-88:5.)

The specifications for the barges called for application of Ameron's Amercoat 253 to the cargo tanks of the barge. (Ameron PFOF ¶ 4.) VMS specified Amercoat 235 as the coating for the cargo tanks on the barges based on its own investigation and recommendations from maritime contractors and operators, none of which is a party to this case. (Schleuter Dep. at 28:1-14.) VMS also wanted a five-year extended warranty on the coating for the cargo tanks and had negotiated directly with Ameron in order to obtain it. With respect to the two units built by Halter, Ameron had agreed to provide a warranty that would run to Halter for the first two years (the extent of Halter's warranty period), and thereafter run directly to VMS. VMS wanted the same warranty on

3

the barges constructed by Manitowoc, except that it would cover the contractor only one year instead of two because of the shorter contractor warranty Manitowoc was offering. (Schleuter Dep. at 32-40.) Manitowoc undertook to "engage Ameron" to secure such a warranty for VMS. (O'Hern Dep. at 91:15-92:5.)

On April 23, 2001, Ameron provided Manitowoc with a written quotation entitled "Coatings System and Cost Proposal" which set forth cost and product information for the coatings to be used on the vessel. For the interior cargo tanks and slop tanks, Ameron specified Amercoat 253. In a letter accompanying its proposal, Ameron stated it would provide "a qualified, full time Technical Serviceman and would also provide the owner with a warranty covering the cargo tank linings on this project." (Krutz Aff., Ex. J.)

On May 9, 2001, Jon Schauske, Manitowoc's production manager on the project, provided Ameron with a copy of Manitowoc's paint specification for various portions of the vessel and the criteria that Manitowoc intended to utilize in preparation for the coating. Schauske asked Ameron to review the enclosures and respond to two questions:

    1)    Would you agree that the criteria standard is acceptable for your coating system?

    2)    Would Ameron stand by the coating systems and supply your warranty to our perspective [sic] customer?

(Krutz Aff., Ex. K.)

Thomas Brown, Director of Marine Marketing for Ameron, responded to Schauske's questions by letter dated May 31, 2001. Brown first noted that the proposed warranty was negotiated with Ed Schleuter of VMS and would be directly between Ameron and VMS. Brown also noted, however, that "we can amend the recipiant [sic] to suit any contract obligations that you

4

may have with VMS to include this within your normal Builder's Warranty." (Krutz Aff., Ex. L.) With respect to Manitowoc's proposed specification, Brown noted that the specification Ameron had provided in its initial proposal was based on its recommendations to VMS upon consideration of the intended cargo for the tanks and the expected service life for the barges in a coastal seawater environment. Since Manitowoc had proposed no change to those specification for the cargo tanks, Brown indicated Ameron had no objection and that portion would not be at risk. Brown further stated, however, that Manitowoc's "proposed procedure for secondary surface preparation of the shop primer, erection welds and other disturbed areas in the ballast tanks would necessitate our having to modify our Warranty in those areas." (Krutz Aff., Ex. L.) Brown recommended several changes for secondary surface preparation in the ballast tanks and interior surfaces, and suggested that both Ameron and Manitowoc discuss the issue with VMS. (*Id.*)

After receiving Ameron's response, Schauske and Jack Schmidt of Manitowoc called Brown to discuss Ameron's requirements for surface preparation. (Krutz Aff., Ex. M.) In particular, Schauske and Schmidt were concerned over Ameron's requirement that the surface interiors of the ballast tanks be power washed prior to application. Manitowoc believed that power washing was not an option in a cold weather region without significantly increasing the labor and materials budget. Although Brown seemed to understand Manitowoc's position, he expressed little hope that Ameron would be willing to provide the warranty VMS had requested if its surface preparation requirements were not met. (Krutz Aff., Ex. M. and Ex. N.) Finally, after a series of email exchanges, Ameron and Manitowoc apparently reached agreement. On June 4, 2001, Brown confirmed with Edward Schlueter, the Director of VMS, that Ameron would provide the previously agreed performance warranty for the ballast tanks based on the surface preparation requirements

5

Manitowoc had agreed to meet.[1]  Brown also confirmed that "the Warranty for the cargo tanks shall also be extended based upon the existing specification."  (Krutz Aff., Ex. Q.)

Manitowoc and VMS finalized their agreement shortly thereafter and entered into a written Vessel Construction Contract on June 19, 2001.  (Hanus Aff., Ex. 7.)  With respect to paint and other coatings, the Vessel Construction Contract between Manitowoc and VMS provided:

> . . . Contractor warrants that it will purchase paint of good marine quality with a five (5) year manufacturer's and/or supplier's warranty applicable to ballast and cargo tanks and that it will apply the paint in accordance with the manufacturer's specifications and recommendations. The manufacturer's and/or supplier's warranty (Third Party Paint Warranty) shall be transferred and assigned to Owner immediately after the Contractor Warranty Period.  Owner agrees to maintain at all times during the Third Party Paint Warranty period detailed records of all cargo carried in the Unit and all cleaning, maintenance and repair (whether ordinary or extraordinary) records with respect to the Unit (collectively, the Required Records). The Third Party Paint Warranty shall be null and void in the event Owner fails to maintain the Required Records in accordance with this Article VII.

(Hanus Aff., Ex. 7 at 12.)  In July of 2001, VMS exercised an option to have a second tug-barge unit (550-4) built.  (*Id.* ¶ 6.)  It is that unit that is the subject of the lawsuit between the parties.

Manitowoc never signed a written warranty agreement with Ameron.  On April 23, 2002, apparently in response to a request from Schauske, Brown provided Manitowoc a copy of the written warranty agreement Ameron had entered into with Halter, the previous builder.  In a cover letter, Brown stated:

> Attached is a copy of the Warranty for the cargo tank that we are providing to the Builder for the first two years, to coincide with the Builder's Warranty.  After that period the Warranty is a matter between ourselves and VMS.

---

[1]The parties advised the court at oral argument, however, that Ameron's agreement to provide VMS a written warranty was not reduced to writing prior to the failure of the coating.  As noted, VMS is no longer a party to the action.

6

This particular Warranty is for two years to coincide with Halter's warranty. Should [Manitowoc]'s be for a different period please let me know so we can amend the document.

Please also be advised that we have not offered VMS any Warranty for any other areas of the vessel.

Should you have any questions please give me a call.

(Krutz Aff., Ex. R.) There is no evidence that Schauske or anyone else at Manitowoc ever got back to Brown and requested a written warranty from Ameron that specifically named Manitowoc as the beneficiary.

On July 2, 2002, Manitowoc purchased Amercoat 253 for 550-4 by submitting a purchase order to Ameron. Although, surprisingly, no copy of the purchase order issued by Manitowoc appears in the record, the record does contain a copy of Manitowoc's standard terms that appeared on the back of its purchase order. (Hanus Aff., Ex. 4, Resp. to Interrog. 1; Ex. 6, Doc. M04330.) With respect to the question of warranties, the purchase order provided:

SELLER warrants that the items and services covered hereunder will conform to applicable specifications, instructions, drawings, data and samples, WILL BE MERCHANTABLE, of good material and workmanship, free from defects and WILL BE FIT AND SUFFICIENT FOR THE PURPOSE INTENDED. These warranties shall be in addition to all other warranties, express, implied or statutory. Payment for, inspection of, or receipt of articles or services shall not constitute a waiver of any breach of warranty.

(Hanus Aff., Ex. 6, Doc. M04330.)

Ameron replied by sending an acknowledgment to Manitowoc. (Krutz Aff., Ex. S.) The acknowledgment contained the following disclaimer of warranties:

Ameron warrants its products to be free from defects in material and workmanship. Ameron's sole obligation and Buyer's exclusive remedy in connection with the products shall be limited, at Ameron's option, to either replacement of products not

7

conforming to this Warranty or credit to Buyer's account in the invoiced amount of the nonconforming products. Any claim under this Warranty must be made by Buyer to Ameron in writing within five (5) days of Buyer's discovery of the claimed defect, but in no event later than the expiration of the applicable shelf life, or one year from the delivery date, whichever is earlier. Buyer's failure to notify Ameron of such nonconformance as required herein shall bar Buyer from recovery under this Warranty.

AMERON MAKES NO OTHER WARRANTIES CONCERNING THE PRODUCTS. NO OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED, OR STATUTORY, SUCH AS WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SHALL APPLY. IN NO EVENT SHALL AMERON BE LIABLE FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES.

Any recommendation or suggestion relating to the use of the products made by Ameron whether in its technical literature on in response to specific inquiry, or otherwise, is based on data believed to be reliable; however, the products and information are intended for use by Buyers having the requisite skill and know-how in the industry, and therefore it is for Buyer to satisfy itself of the suitability of the products for its own particular use and it shall be deemed that Buyer has done so, at its sole discretion and risk. Variations in environment, changes in procedures of use, or extrapolation of data may cause unsatisfactory results.

(McCarthy Aff., Ex. 2.) Ameron's product data sheet, which Manitowoc had in its possession at least by April 25, 2002, contained a substantially identical disclaimer. (Hanus Aff., Ex. 11.)

Manitowoc hired IMIA to apply the cargo tank paint to cargo barge unit 550-4. (Ameron PFOF ¶ 9.) IMIA applied Amercoat 253 to the cargo tanks during the fall of 2002. Construction of 550-4 was substantially complete on December 9, 2002, and the unit departed soon thereafter for Jacksonville, Florida. (*Id.* ¶ 11.) While 550-4 was in Jacksonville, Manitowoc noticed a brownish goo known as amine blush on the surfaces of the cargo tanks. (*Id.* ¶ 12.) Attempts to clean the amine blush led to delamination of the cargo tank paint, which eventually had to be replaced at a cost of approximately $1.8 million, $1.3 million of which represents unpaid invoices submitted to Manitowoc by IMIA for its time and materials in re-coating the cargo tanks. (*Id.* ¶ 13.)

8

Manitowoc's and IMIA's experts now state that the low temperatures at which Amercoat 253 was applied and the relatively short induction times during the application caused the problems with the paint.[2] (Hare Dep. at 92:10-15; Machen Dep. at 189:6-14; *see also* Krutz Aff., Ex. Y at 27-31.) As a result, Manitowoc and IMIA have settled their claims against each other, with IMIA agreeing to dismiss its claims against Manitowoc for the $1.3 million in outstanding invoices in return for a percentage of the recovery, if any, against Ameron. (Hanus Aff., Ex. 12.)

As the case stands now, Manitowoc claims that Ameron expressly and impliedly warranted that Amercoat 253, if applied in accordance with Ameron's specifications, would not fail. Manitowoc contends that the evidence shows that the Amercoat was applied according to Ameron's specifications. Since the coating clearly failed, Manitowoc argues that Ameron is liable for costs it incurred in removing the original coating and applying a new coating to the cargo tanks. For its claim, IMIA alleges that Ameron fraudulently withheld information that Amercoat 253 has a propensity for amine blush, that Ameron had experienced similar product failures on the Mississippi coast during the summer of 2002, and that the product required longer induction times in cold weather than those recommended on Ameron's Product Data Sheet. IMIA contends that Ameron had a duty to disclose such information to IMIA and that its failure to do so constitutes fraud both under the law of Alabama, which IMIA contends should apply to its claim, and the law of Wisconsin.[3]

---

[2]Ameron's product data sheet recommended applying Amercoat 253 at temperatures between 50° F and 100° F. (Ameron PFOF ¶ 23; McCarthy Aff., Ex. 1.)

[3]IMIA also asserted cross-claims against Ameron for contribution and indemnity. It states in its brief in opposition to Ameron's motion, however, that those claims can be dismissed in light of its settlement agreement with Manitowoc. (IMIA Br. In Opp. at 2.)

Ameron, on the other hand, denies that it gave any express warranty to Manitowoc. Since no express warranty was given to Manitowoc, Ameron claims that summary judgment should be granted on Manitowoc's claim for breach of express warranty. Ameron also contends that Manitowoc cannot recover under any implied warranty of merchantability or fitness for a particular purpose. Manitowoc cannot recover for breach of an implied warranty of merchantability, Ameron argues, because there is no evidence of any design or manufacturing defect in its product. And Manitowoc cannot establish a claim for breach of an implied warranty of fitness for a particular purpose, Ameron contends, because it is undisputed that Manitowoc did not rely on Ameron's skill and judgment to select Amercoat 253. Moreover, even if there was evidence to support a claim under an implied warranty, Ameron argues that it effectively disclaimed such warranties as to Manitowoc. Thus, Ameron contends, summary judgment should be granted on Manitowoc's claims for breach of an implied warranty as well. As to IMIA's claim for fraud, Ameron argues that the evidence supports no such claim under Wisconsin law, which it contends is the only law that applies. Finally, Ameron argues that because IMIA has no direct claim against it for $1.3 million Manitowoc owes it for re-coating the cargo tanks, and because IMIA has dismissed its claim for the unpaid invoices against Manitowoc, any claim Manitowoc may have against Ameron cannot include that amount.

## ANALYSIS

### I. Express Warranty

Under Wisconsin law,[4] a warranty is "an assurance by one party to a contract of the existence of a fact upon which the other party may rely." *Dittman v. Nagel*, 168 N.W.2d 190, 193 (Wis. 1969)

---

[4]Although IMIA argues that Alabama law should apply as to its cross-claim against Ameron, the parties are in agreement that Wisconsin law governs Manitowoc's warranty claims against Ameron. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). IMIA's argument that Alabama law applies to its claim against Ameron will be discussed below.

(citation omitted). Generally, a warranty is a representation as to the quality or quantity of goods sold and it "relieve[s] the promisee of any duty to ascertain the fact for himself, and amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Id.* at 193 (citation omitted). A warranty thus places the burden of ascertaining the truth of the representation on the seller so that the buyer is not required to confirm the warranted facts. The creation of warranties in connection with a contract for the sale of goods is governed by the Uniform Commercial Code. Section 2-313 of the Uniform Commercial Code, as adopted in Wisconsin, provides:

> Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Wis. Stat. § 402.313(1).

Ameron contends that any express warranty it made ran only to VMS, not Manitowoc, and thus Manitowoc has no remedy against it. Although the evidence shows that Ameron offered to provide an express warranty to Manitowoc, Ameron contends Manitowoc never requested one and thus none was ever provided. In Ameron's view, the record discloses nothing more than "hypothetical discussions between Ameron and Manitowoc about the mere possibility of providing a written warranty to Manitowoc." (Ameron Reply Br. in Supp. of Summ. J. on Claims of Manitowoc at 1.) It argues that since the essential terms of a written warranty between Ameron and Manitowoc were never agreed to, no warranty was given to Manitowoc.

11

Ameron confuses the requirements for the formation of a contract with what is needed for the creation of a warranty. It is true that for a contract to be formed, the parties must reach agreement on the essential terms. *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 75 (Wis. 1996). And "[u]nder Wisconsin law, agreements to agree do not create binding obligations." *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987) (citing *Witt v. Realist, Inc.*, 118 N.W.2d 85, 93-94 (Wis. 1962)). Here, however, there is no dispute that Manitowoc and Ameron entered into a contract. Ameron agreed to sell and Manitowoc agreed to buy enough Amercoat 253 to cover the interior cargo and ballast tanks on the oil transport barge Manitowoc was building for VMS. The question here is not whether Manitowoc and Ameron entered into a contract; the question here is whether Ameron created an express warranty.

The requirements for the creation of a warranty are not as onerous as those for the creation of a contract. The fact that Ameron never provided Manitowoc a warranty in writing does not mean that no express warranty was provided at all. Under Wisconsin law, a warranty need not be in writing to be enforceable. *See Ewers v. Eisenzopf*, 276 N.W.2d 802, 804-05 (Wis. 1979) (holding that store clerk's statement that items sold were suitable for placement in salt water aquarium sufficient to create an express warranty). Nor is it necessary that the seller use specific words or even intend to create a warranty. *Id.* at 805; Wis. Stat. § 402.313(2). All that is required is that the seller make an affirmation of fact or a promise to the buyer and that the affirmation of fact or promise by the seller becomes "a basis of the bargain." Wis. Stat. § 402.313(1)(a). Moreover, the affirmation or promise does not have to be the sole basis for the sale; it need only be "a factor in the purchase." *Ewers*, 276 N.W.2d at 805. The question of whether a seller's affirmation created an express warranty "normally is one of fact." *Id.* (quoting U.C.C. § 2-313 cmt. 3).

12

Based on the evidence in the record, I conclude that a reasonable jury could find that Ameron created an express warranty in the course of its negotiations with Manitowoc. A jury could find from the evidence that Ameron assured Manitowoc that if Amercoat 253 was applied to the cargo tanks according to the specifications to which the parties had agreed, it would not fail for at least five years. It was just such a warranty, after all, that VMS insisted that Manitowoc provide if Manitowoc was to construct its vessel, and Manitowoc negotiated directly with Ameron in order to make sure Ameron would provide it before it finalized its agreement with VMS. Manitowoc needed assurance that Ameron would provide the warranty VMS was demanding, and Ameron gave that assurance when the parties reached agreement on how the product was to be applied. The suggestion implicit in Ameron's argument that no warranty could have been created in favor of Manitowoc, the anticipated buyer of the product, in the absence of a clear and unequivocal statement by Ameron that it was providing a warranty directly to Manitowoc is contrary to language and intent of the U.C.C. *See* Wis. Stat. § 402.313(2) ("It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that the seller have a specific intention to make a warranty."). The evidence shows that in essence, if not in the precise words, Ameron told Manitowoc that if its product was applied in the manner agreed upon, it would not fail for five years. This is sufficient to create an express warranty.

Ameron next argues that no express warranty was created in favor of Manitowoc because Manitowoc did not rely on any statement or promise made by Ameron in deciding to purchase its product. The sole reason Manitowoc purchased Amercoat 253, Ameron argues, was because VMS specified that product as the epoxy that was to be used to coat the interior of the cargo and ballast tanks. Ameron cites the official comment to U.C.C. § 2-313, which states that "'[e]xpress'

13

warranties rest on 'dickered' aspects of the individual bargain, and go so clearly to the essence of that bargain that words of disclaimer in a form are repugnant to the basic dickered terms." U.C.C. § 2-313 cmt. 1. Because VMS made the decision to use Amercoat 253, Ameron claims Manitowoc cannot prove that it relied upon any promise or affirmation of fact made by Ameron in deciding to purchase the product. According to Ameron, "Manitowoc did not 'dicker' with Ameron and did not purchase the paint because of, or in reliance upon, any representations by Ameron." (Ameron Br. In Supp. of Mot. for Summ. J. at 10.)

On this issue also, however, I conclude a reasonable jury could find otherwise. It is true that VMS specified Amercoat 253 as the coating for the cargo tanks. But Manitowoc did not finalize its contract with VMS until it had obtained direct assurances from Ameron that Ameron would stand behind its product. Manitowoc's internal memoranda clearly suggest that Manitowoc would not have entered into the contract, as proposed by VMS, if Ameron had not represented that the application procedure to which Manitowoc agreed would be acceptable to Ameron and that Ameron would warrant that its product would last at least five years. In his June 1, 2001 memo, Schauske noted that when Brown told him he would have to get back to him on Monday on whether Ameron would accept surface preparation that did not include power-washing, Schauske told Brown "that was too late and this contract was going to move ahead or be lost today." (Krutz Aff., Ex. N.) Even Ameron's own documents recognize that Manitowoc was relying on Ameron's representations in deciding whether to proceed with VMS. In a June 1, 2001 fax to VMS describing the difficulties Manitowoc was having meeting Ameron's demands, Brown acknowledges that Manitowoc "needs a response from us urgently as they were trying to finalize their negotiations with VMS." (Krutz Aff., Ex. O.) This evidence suggests that had Manitowoc not reached agreement with Ameron over

14

surface preparation, Manitowoc would not have entered into its contract with VMS, and had it not entered into that contract, Manitowoc would not have purchased Ameron's product. Thus, a jury could reasonably find that Manitowoc relied upon Ameron's representations in deciding to purchase Amercoat 253.

## II. Implied Warranties

Manitowoc also claims Ameron breached its implied warranties of merchantability and fitness for a particular purpose. Even where no express warranties are given, U.C.C. § 2-314 provides that "[u]nless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Wis. Stat. § 402.314. In addition, U.C.C. § 2-315 states that "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose." Wis. Stat. § 402.315. Manitowoc claims that both of these implied warranties arose under the circumstances of this case and that there exists sufficient evidence to show that Ameron breached them.

The term "merchantable," as defined in the U.C.C., includes the assurance that the goods purchased are "[a]re fit for the ordinary purposes for which such goods are used." Wis. Stat. § 402.314(2)(c). Manitowoc contends that a jury could conclude that the Amercoat 253 it purchased from Ameron was not merchantable in that it was not fit for the ordinary purpose for which it was used. Manitowoc notes that the ordinary purpose for which the product was used was as a liner to

15

protect the interior of the cargo tanks from the corrosive effects of the invasive cargos that the tanks were to carry. Clearly, the product failed to fulfill that purpose; almost immediately after it was applied, amine blush developed and the paint began to severely delaminate. Although Ameron contends that the product failed because it was not properly applied, there is evidence from which a jury could conclude that it was applied in accordance with the instructions provided by Ameron. A product that fails to accomplish its ordinary purpose when used in accordance with the merchant's instructions is not merchantable.[5] Thus, there is evidence from which a jury could conclude that Ameron breached an implied warranty of merchantability.

With respect to an implied warranty of fitness for a particular purpose, Ameron argues that Manitowoc has adduced no evidence that Manitowoc relied on Ameron's skill and judgment to select the coating for the interior cargo tanks. In its Amended Complaint, Manitowoc pled that "VMS specified that one of Ameron's products, "Amercoat 253," . . . was to be used for the interior lining of the cargo tanks of the barge." (Am. Compl. ¶¶ 11, 20.) Consistent with this allegation, Ameron notes that Edward Schlueter, VMSI's director responsible for ordering 550-4, explained that VMS specified Amercoat 253 at the time it first discussed contracting with Manitowoc to build the barge. (Schlueter Dep. at 26:13-27:8.) VMS selected Amercoat 253 because of recommendations from maritime contractors and operators, none of which is a party to this case.

---

[5]Ameron argues that "[a]lthough some courts in other jurisdictions have held that failure to properly instruct or warn with respect to an 'unreasonably dangerous' condition may give rise to a breach of implied warranty of merchantability, those cases are limited to the inadequacy of warning or instructions that give rise to personal injury or property damage." (Br. In Supp. of Summ. J. at 17.) But this is not a case in which Ameron is alleged to have failed to give warnings or instructions. In this case, Ameron did give instructions and there is evidence that even though Ameron's instructions were followed, its product failed its ordinary purpose.

16

(Schlueter Dep. at 28:1-14.) Because VMS selected Amercoat 253 for the cargo tanks of 550-4, Ameron argues no implied warranty of fitness for a particular purpose exists.

But as noted above, the fact that VMS had selected Amercoat 253 as the coating for the cargo tanks on its barges does not mean that Manitowoc did not rely upon Ameron's skill and judgment in deciding whether it would purchase its product. Manitowoc did not enter into the contract with VMS requiring the use of Amercoat 253 until it had first received the assurance from Ameron that its product would meet VMS's requirements. In other words, VMS's selection of Amercoat was separate and distinct from Manitowoc's. And in deciding whether it would agree to VMS's terms and thereby commit itself to "select" Amercoat 253, a reasonable jury could conclude that Manitowoc relied on Ameron's skill and judgment. There is no dispute that Ameron knew of the particular purpose for which its product was required and the manner in which it would be applied.

Finally, Manitowoc also points to a letter from Ameron to Manitowoc, dated April 23, 2001, in which Ameron provides a "Coating System and Cost Proposal" to Manitowoc. (Krutz Aff., Ex. J.) The document refers to Amercoat 253 as the material for the interior cargo tanks and slop tanks. (*Id.* at 000453.) While the origin and intent of this document is unclear, Manitowoc argues that it is evidence that Ameron "selected" Amercoat 253 for the project. In light of this evidence, I am unable to say as a matter of law that no implied warranty of fitness for a particular purpose arose.

**III. Disclaimer of warranties**

Ameron next argues that even if express or implied warranties may have arisen in the course of its transaction with Manitowoc, it disclaimed all such warranties, with the exception of an express limited warranty for defects in material and workmanship, in its product data sheet and its

17

acknowledgment of Manitowoc's purchase orders. Under the U.C.C. parties to a contract may disclaim or limit both express and implied warranties. The pertinent provisions of U.C.C § 2-316 read:

> 1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to s. 402.202 on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable.

> 2) Subject to sub. (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

> . . .

Wis. Stat. § 402.316. Ameron contends that the Terms and Conditions of Sale that appear on the reverse side of its Acknowledgment form are intended to and did disclaim the very types of express and implied warranties upon which Manitowoc basis its claims.

Manitowoc argues, however, that it never accepted Ameron's Terms and Conditions of Sale and thus under U.C.C. § 2-207 Manitowoc is not bound by them. Manitowoc notes that Ameron's warranty disclaimers and limitations were not contained in its purchase orders. In order for such terms to become part of the contract between the parties, Manitowoc argues, it must have unequivocally assented to the additional or different terms. Because Ameron has produced no evidence of its assent, Manitowoc argues that the warranty disclaimers and limitation do not apply. (Manitowoc Br. in Opp. to Mot. for Summ. J. at 25.)

18

At the outset I note that even if Ameron's Terms and Conditions of Sale are applicable, they would not be construed so as to disclaim the express warranty Manitowoc claims to have received from Ameron. Under U.C.C. § 2-316(1), words or conduct tending to negate or limit an express warranty are "inoperative to the extent that such construction is unreasonable." Wis. Stat. § 402.316(1). According to the official comment to the U.C.C.,

> [t]his section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude 'all warranties, express or implied. It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with the language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise.

U.C.C. 2-116 cmt. 1. In effect, U.C.C. § 2-316(1) prevents a seller from excluding an express warranty on which the buyer relied through the use of a form containing standard terms and conditions that the buyer never acknowledged or signed. *See Paulson v. Olsen Implement Company, Inc.*, 319 N.W.2d 855, 860 (Wis. 1982) ("Even if we determine that the words on the back of the Super Steel form relate to and disclaim Miller's express warranty regarding the capabilities of the specially manufactured equipment, they could not be construed as an effective disclaimer because they would be inconsistent with the express warranty, and they result in unbargained for language and the buyer's surprise.") (citing J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* at 431- 33 (2d ed. Hornbook Series 1980)). Thus, regardless of whether Ameron's terms and conditions apply, I conclude that Manitowoc's express warranty claim survives. As the following analysis will show, however, Ameron's terms and conditions do not apply and thus Manitowoc's implied warranty claims also survive.

19

The arguments of the parties on the issue of which parties' terms and conditions control reflect the classic "battle of forms" that often results from sales between commercial parties. Ameron contends that its Terms and Conditions of Sale control because its acceptance of Manitowoc's purchase order was subject to those terms and conditions. But under U.C.C. § 2-207, a party cannot change the terms of an offer simply by stating that its acceptance is "subject to" its own terms and conditions. More is required.

U.C.C. § 207 was intended to abrogate the common law "mirror image" rule under which the acceptance of an offer, to be effective, had to be the mirror image of the offer. If the acceptance deviated in any way, even in minor respects, the acceptance was ineffective and no contract was formed. The result was that, given the realities of modern commerce with sellers and buyers each using their own forms that were seldom in complete agreement, disgruntled parties were able too easily to avoid contracts. U.C.C. § 207 avoids this result in that it "rejects the common law mirror image rule and converts many common law counteroffers into acceptances . . . ." James J. White & Robert S. Summers, *Uniform Commercial Code* § 1.3 at 31 (5th ed. West Hornbook Series 2000) (hereinafter "White & Summers"). But the effect of U.C.C. § 2-207 is not just at the contract formation stage. Its more common function is to determine the terms of contracts that result from such an exchange of forms after the parties have already concluded the transaction and a dispute has arisen. *Id.* That is its function here.

The text of U.C.C. § 2-207 reads:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

    (a) The offer expressly limits acceptance to the terms of the offer;

    (b) They materially alter it; or

    (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provision of chs. 401- 411.

Wis. Stat. § 402.207.

Under subsection (1), assuming Manitowoc's purchase order was sufficiently definite to constitute an offer, something both parties appear to assume but do not address, an acknowledgment containing additional or different terms nevertheless operates as an acceptance even though it contains terms additional to or different from those in the purchase order, unless the acceptance was expressly made conditional on the offeror's assent to the additional or different terms. Where an acknowledgment containing additional or different terms is not made conditional on the other party's assent to those additional or different terms, a contract is formed and the additional terms are treated as proposals for addition to the contract. Whether the additional terms become part of the contract is determined under subsection (2), which provides that between merchants the additional terms will become part of the contract unless they alter it materially, are objected to, or the offer expressly limits acceptance to its own terms. *Rich Products Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 960 (E.D. Wis. 1999). What happens to terms that are "different", as opposed to "additional", is not as clear. Different terms, which are not mentioned in subsection (2), presumably

drop out, although that is an issue on which there remains considerable debate. White & Summers § 1.3 at 34; *see Rich Products Corp.*, 66 F. Supp. 2d at 960 n. 18. Even if different terms were considered as proposals for addition to the contract under subsection (2), it seems the result would generally be the same since a proposed term that differed from the term of the offer, i.e., warranty versus no warranty, would materially alter the contract. *See, e.g., Mead Corporation v. McNally-Pittsburg Manufacturing Corporation*, 654 F.2d 1197, 1206 (6th Cir.1981). Still, some courts conclude that where the terms contradict each other, both drop out. *See Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1578-79 (10th Cir.1984).

But that is only the scenario when the acceptance is not expressly conditioned upon the offeror's assent to the addition or different terms. If the acknowledgment does make acceptance expressly conditioned upon the other party's assent to the additional or different terms, the acknowledgment becomes a traditional counter-offer and no contract is formed unless the original offeror expressly assents to the counter-offer. *Rich Products*, 66 F. Supp.2d at 960-61. Where no contract is formed through the exchange of forms by the parties but they nevertheless follow through on the transaction, a contract will deemed established under subsection (3), the terms of which are those terms on which the writings of the parties agree, together with such terms as the U.C.C. provides by default, so-called "gap fillers". White & Summers § 1.3 at 40.

From the foregoing, it follows that the first determination a court must make in applying U.C.C. § 2-207 is whether the acceptance or acknowledgment of the offer was "expressly made conditional on assent to the additional or different terms." Wis. Stat. § 402.207(1). It is not enough that an acceptance is expressly conditional on additional or different terms; to avoid entering into a contract on the terms originally offered, the offeree's acceptance must be expressly conditional

22

on the offeror's assent to the additional and/or different terms. *C. Itoh & Co. v. Jordan International Co.*, 552 F.2d 1228, 1235 (7th Cir. 1977). However, "a document need not mimic the language of the proviso in order to be a conditional acceptance." *Rich Products*, 66 F. Supp.2d at 961 (citing *White Consolidated Industries, Inc. v. McGill Manufacturing Co., Inc.*, 165 F.3d 1185, 1191 (8th Cir.1999). "To require the exact language of the UCC would be too formalistic and inconsistent with the UCC's requirement that its provisions be liberally construed." *Id.*, at 1191; *C. Itoh & Co.*, 552 F.2d at 1235. Instead, "it is only necessary that the acceptance itself, and/or the circumstances leading up to and surrounding the acceptance go beyond making the acceptance subject to its own terms and conditions such that it becomes clear that the offeree is unwilling to proceed unless assured of the offeror's assent to the additional or different terms." *Rich Products*, 66 F. Supp.2d 961 (internal citations and brackets omitted).

Here, Ameron's acknowledgment of Ameron's purchase order contained the following notation at the bottom of the front page: "All Ameron sales are subject to its terms and conditions contained on the reverse side hereto." (McCarthy Aff., Ex. 2,) This language is clearly insufficient to avoid formation of a contract under U.C.C. § 2-207(1). *C. Itoh & Co.*, 552 F.2d at 1235. But the acknowledgment also contained the following language on the reverse side under the heading "Terms And Conditions of Sale:

> Any conduct by Buyer which recognizes the existence of a contract pertaining to the subject matter hereof, including without limitation, Buyer's written acceptance or acknowledgment of these terms and conditions, or its acceptance of delivery of goods, shall constitute acceptance by Buyer of all of the following terms and conditions. Acceptance is limited to acceptance of the express terms contained on the face and back hereof. Any additional or different terms which may be contained in Buyer's purchase order or any other documents furnished by Buyer are hereby objected to and deemed material unless accepted in writing by an authorized representative of Ameron.

(McCarthy Aff., Ex. 2.)

23

While even this language does not fit neatly within the proviso of Wis. Stat. § 402.207(1), I conclude that it is sufficient to make clear Ameron's intention to avoid a contract on any terms other than its own. Ameron's acknowledgment is similar to one used by the seller in *Dresser Industries, Inc., Waukesha Engine Div. v. Gradall Co.,* 702 F.Supp. 726 (E.D. Wis. 1988), *aff'd,* 965 F.2d 1442 (1992). In *Dresser Industries*, the seller acknowledged the buyer's purchase order with a form that stated:

> Your order has been entered expressly subject to and conditioned on the understanding that our terms of sale stated on the front and reverse sides hereof, and no others, apply to this sale. Please contact us immediately if you have any questions. IF WE DO NOT HEAR FROM YOU WITHIN TEN (10) DAYS, WE WILL PROCEED WITH PERFORMANCE AND SHIPMENT ON THE ASSUMPTION THAT YOU AGREE TO TERMS OF SALE STATED OR REFERRED TO HEREIN.

702 F. Supp. at 729. Notwithstanding the failure of the seller to use the precise language of the U.C.C., namely, that the agreement was conditioned on the buyer's "assent" to seller's terms, the court concluded that the seller's acceptance was conditional, thus preventing the formation of a contract on the terms stated in the buyer's purchase order alone. As a result, no contract was formed by the parties writings. And since the parties had nevertheless followed through on their transaction, the court concluded a contract was established under Wis. Stat. § 402.207(3) and looked to that section to determine its terms. *Id.* at 732-33.

Ameron's acknowledgment is to the same effect. It states the Ameron is agreeing to the sale on its own terms and conditions and no others, even those included in the Buyer's purchase order, absent the written consent of an authorized representative. This language made Ameron's acknowledgment a counteroffer. For Ameron's counteroffer to ripen into a contract, Manitowoc would have had to unequivocally assent to it. *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794

24

F.2d 1440, 1443 (9th Cir.1986); *Rich Products Corp.*, 66 F. Supp.2d at 961; and *Dresser Industries*, 702 F. Supp. at 733. Manitowoc's failure to object, without more, does not amount to its unequivocal assent. Accordingly, no contract was formed.

But since the parties followed through with their transaction, a contract is established under Wis. Stat. § 402.207(3) consisting of the terms on which the parties agreed, together with any supplementary terms incorporated under the U.C.C. Because the parties' forms disagree on disclaimer and limitation of warranty, those terms drop out. Absent any disclaimer or limitation of warranty, all of Manitowoc's warranty claims survive. Summary judgment on the ground that Ameron effectively disclaimed all express and implied warranties must therefore be denied.[6]

## IV.  Cross-claim by IMIA

Ameron also argues that it is entitled to summary judgment on IMIA's remaining cross-claim for fraudulent suppression. In Alabama, where IMIA is domiciled and has its principal place of business, the tort of fraudulent suppression has been codified. Ala. Code 1975, § 6-5-102 states: "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." IMIA contends that under Wisconsin's choice of law principles, Alabama law applies to its claim against Ameron and that there is sufficient evidence

---

[6]Ameron also argues that it disclaimed warranties and limited buyer's remedies through its product data sheet. (Ameron Br. In Supp. of Mot. for Summ. J. at 18-19.) The product data sheet for Amercoat 253 contained virtually the same disclaimers and limitations as the terms and conditions of Ameron's acknowledgment. (McCarthy Aff., Ex. 1.) It appears, however, that the product data sheet was intended to provide specific product information to customers in general. Nothing in the product data sheet suggests that Ameron was unwilling to offer more generous warranties with specific customers, as it clearly intended to do with VMS, or that it did not do so here with Manitowoc. I do not find the language in the product data sheet relevant to this issue.

25

to withstand Ameron's motion for summary judgment. According to IMIA, the evidence shows that Ameron knew, but concealed from IMIA, the fact that Amercoat 253 was susceptible to amine blush, especially when applied in low temperatures. IMIA claims that it relied on Ameron's failure to disclose to its detriment. (Docket #32, ¶ 18.) After the coating failed, IMIA claims it was hired by Manitowoc to repaint the cargo tanks at the Atlanta Marine facility in Mobile, Alabama. It did so at a cost of almost $1.3 million which remains due and owing. IMIA seeks recovery of this amount from Ameron, as well as damages for other losses, including loss of business reputation.

Ameron argues that it is entitled to summary judgment on IMIA's claim because the law of Wisconsin, not Alabama, applies in this case and the evidence does not support a claim of fraud under Wisconsin law. Ameron also argues that having settled with Manitowoc and dismissed its claim for the $1.3 million it was owed for the remedial work it performed, IMIA has extinguished any claim it might have had against Ameron for that amount. And since Manitowoc no longer owes IMIA for the cost of the remedial work it performed on the vessel after the coating failed, Ameron argues that Manitowoc cannot recover such costs from Ameron, even if Ameron is ultimately found liable to Manitowoc.

Turning first to the question of whether IMIA's claim survives, I conclude it does not regardless of which state's law is applied. IMIA's claim fails for the simple reason that IMIA suffered no harm as a result of the failure of Ameron to disclose the alleged defects in its product, whether fraudulent or not. An essential element of a claim of fraud, whether the fraud alleged takes the form of an affirmative misrepresentation or a material omission, is that the plaintiff detrimentally relied upon the fraud. *See Mackenzie v. Miller Brewing Co.*, 623 N.W.2d 739, 745 (Wis. 2001); *Wilson v. Brown*, 496 So.2d 756, 759 (Ala.1986). In other words, the plaintiff must

have suffered a loss as a result of the fraud alleged. Here, there is no evidence that IMIA suffered any loss as a result of anything Ameron may have done. In fact, if anything, IMIA stood to benefit from the failure of Ameron's product. IMIA was hired to apply the Amercoat 253 and, as far as the record reveals, was fully paid for this work. After the coating failed, IMIA was again hired by Manitowoc on a time and material basis to re-apply the coating. The unpaid invoices for the repair work amount to an additional $1.3 million IMIA was entitled to receive for its work on the project. Although Manitowoc has not paid IMIA for the repair work, nothing Ameron is alleged to have done provides a justification for Manitowoc's failure to pay IMIA. Thus, IMIA can show no harm resulting from Ameron's conduct.

Even if IMIA could show harm, its claim of fraud against Ameron would still fail under the applicable Wisconsin law. In determining which state's law applies, this court applies Wisconsin choice-of-law rules in a diversity case. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503 (7th Cir.1998). Under those rules, the court must first consider whether Alabama law conflicts with Wisconsin law in any relevant aspect. *Thiele v. Northern Mut. Ins. Co.*, 36 F. Supp. 2d 852, 854 (E.D. Wis. 1999). If it does, the court must determine "whether the contacts of one state to the facts of the case are so obviously limited and minimal that application of that state's law constitutes officious intermeddling." *Id.* (quoting *American Standard Ins. Co. of Wis. v. Cleveland*, 369 N.W.2d 168, 171 (Wis. Ct. App.1985)). If that determination is made in the negative, the court must decide which state's law applies by considering "1) predictability of results; 2) maintenance of interstate and international order; 3) simplification of the judicial task; 4) advancement of the forum's governmental interests;

and 5) application of the better rule of law." *Id.* (citing *Lichter v. Fritsch*, 252 N.W.2d 360, 363 (Wis. 1977)).

As the dispute between Ameron and IMIA suggests, the difference between Wisconsin and Alabama law is significant. *Compare Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 244 (Wis. 2004) ("The economic loss doctrine bars the plaintiffs' common-law fraud claim.") *with Hopkins v. Lawyers Title Ins. Co.*, 514 So. 2d 786, 790 (Ala. 1986) ("[A] duty in a fraud action may exist in the absence of a contractual relationship or without dealing between the parties."), *overruled on other grounds by State Farm Fire and Cas. Co. v. Owen*, 729 So. 2d 834 (Ala. 1998). Nor are Alabama's contacts with this case so minimal as to make the contention that its law should apply frivolous. IMIA is an Alabama corporation, and preparation of its bid for 550-4, including the review of Ameron's technical data, took place in Alabama. (Am. Compl. ¶ 4; Cherniak Aff., Ex. K.) Nevertheless, any fraud by Ameron would have affected Manitowoc, a Nevada corporation doing business through its Wisconsin subsidiary, in the first instance. Litigation between those parties would almost certainly be governed by Wisconsin law. No reason exists to apply Alabama law to litigation between Manitowoc and Ameron. Were the court to apply Alabama law to IMIA's fraud claim, potential claims arising out of the same alleged fraud would be analyzed by different legal standards. This would lead to unpredictable results, confusion over the applicable rule of law in similar cases, and complication of the task of the court. No substantial governmental interest bears on this private litigation, and neither party makes a compelling argument that one state has adopted a better rule of law than the other. Taken as a whole, the five-factor analysis favors application of Wisconsin law to IMIA's fraud claim.

28

IMIA's fraud claim is doomed under Wisconsin law. Wisconsin courts have repeatedly held that the economic loss doctrine bars fraud claims when the plaintiff suffered only economic loss, as opposed to personal injury or property damage. *Tietsworth*, 677 N.W.2d at 241-242; *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 844-845 (Wis. 1998). This doctrine applies even where, as here, there is no privity of contract between the parties. *Digicorp, Inc, v. Ameritech Corp.*, 662 N.W.2d 652, 666 (Wis. 2003) ("[E]ven in the absence of privity, the economic loss doctrine bars one party in the distributive chain from recovering economic losses in tort from another party in that chain."). IMIA suffered no personal injury or property damage as a result of the tank lining's failure. Rather, its damages were limited to the costs of replacing the linings themselves. (Cherniak Aff., Exs. K, N.) Recovery of these costs is barred by the economic loss doctrine. Accordingly, Ameron's motion for summary judgment on IMIA's claim of fraud will be granted.

There remains, however, the question of whether IMIA's claim for the cost of its remedial work remains a viable part of Manitowoc's claims against Ameron. As noted above, IMIA and Manitowoc settled their respective claims against each other after their experts concluded that it was Ameron's product and/or application instructions, and not IMIA's application of the coating, that caused the failure. In their written settlement agreement, Manitowoc and IMIA agreed that "the cause of the failure of the Amercoat 253 in the interior cargo tanks of the Vessel was a problem with the paint itself and/or with the specifications provided by Ameron with respect to the application of the paint[.]" (Hanus Aff., Ex. 12.) Manitowoc and IMIA dismissed their respective claims against one another and agreed to share any recovery from Ameron 65% (IMIA) - 35% (Manitowoc). (*Id.*) Ameron contends that in light of the IMIA's dismissal of its claim against

29

Manitowoc, Manitowoc has no claim against it for the $1.3 million it previously owed IMIA for the remedial work done on the barge.

In response, Manitowoc argues that its settlement with IMIA has no effect on Ameron's liability to it. Manitowoc notes that settlements are favored under Wisconsin law and the terms and conditions of settlement are "solely in the hands of the parties." (Manitowoc Br. in Opp. at 27.) (quoting *Quad/Graphics, Inc. v. Fass*, 724 F.2d 1230, 1232 (7th Cir. 1983)). "Opening up the settlement for determinations as to its resulting rights and obligations would be contrary to the policy of encouraging settlement." (Manitowoc Br. at 28.) Since neither party to the settlement has asked the court to determine its effect, Manitowoc argues it would be improper for the court to do so. (*Id.*)

Neither *Quad/Graphics*, nor any other case cited by Manitowoc, supports its contention that it would be improper for the court to determine the effect of its agreement with IMIA on its claim against Ameron. On the contrary, Wisconsin courts are frequently required to determine the effect of settlement agreements on claims against other parties. *See, e.g., Loy v. Bunderson*, 320 N.W.2d 175 (Wis. 1982); *Pierringer v. Hoger*, 124 N.W.2d 106 (Wis. 1963). The issue Ameron has raised is not the fairness of the settlement reached by Manitowoc and IMIA, but rather the effect of their settlement upon the claim against it. This is a proper matter to be determined by the court.

The court having concluded that IMIA has no claim against Ameron, it obviously follows that IMIA is unable to recover the amount due it for the remedial work it performed on VMS's barge from Ameron.[7] Whether Manitowoc can recover the cost of the remedial work performed by

---

[7]The conclusion that IMIA has no claim against Ameron also means that the mutual assignment by IMIA and Manitowoc of their respective claims to each other has no effect with respect to IMIA's claim for the costs of the repair work it performed. Since IMIA had no valid claim against Ameron, its assignment of its claim to Manitowoc is of no significance.

IMIA as damages on its claims depends on whether Manitowoc either paid or remains liable for those costs. The parties agree that Manitowoc did not pay IMIA for the work. Thus, the only way Manitowoc could recover the cost of the repair work from Ameron, assuming of course Ameron is ultimately found liable, is if Manitowoc remains liable to IMIA for those costs. It is clear from the terms of their settlement agreement, however, that IMIA has dismissed its claim against Manitowoc. It therefore follows, at least as things now stand, that Manitowoc cannot recover as damages the costs of the remedial work performed by IMIA.[8]

### CONCLUSION

For the foregoing reasons, Ameron is entitled to summary judgment on all of IMIA's cross-claims. In all other respects, Ameron's motion for summary judgment is denied, except that Manitowoc's recovery, if any, cannot include the costs of the remedial work performed by IMIA.

As a final matter, Manitowoc filed a motion to strike certain documents filed by Ameron in its reply. Those documents and the additional facts asserted by Ameron do not change the result. Accordingly, Manitowoc's motion to strike will be denied as moot.

**IT IS THEREFORE ORDERED** that Ameron's motion for summary judgment (Docket #133) is hereby **GRANTED** as to all cross-claims of IMIA, but **DENIED** as to the claims of Manitowoc Marine.

**IT IS ALSO ORDERED** that Manitowoc's motion to strike (Docket #156) is **DENIED**.

---

[8]I leave aside the question of whether Manitowoc and IMIA could, by mutual agreement, rescind or reform their settlement agreement in such a way as to "resurrect" the claim for the costs of IMIA's recoating work.

31

Finally, the Clerk shall set this matter for a Rule 16 telephone conference within the next fourteen days.

Dated this __27th__ day of March, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge