# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MANITOWOC MARINE GROUP, LLC

        Plaintiff,

    v.                                    Case No. 03-C-232

AMERON INTERNATIONAL CORP., et al.,

        Defendants.

---

## DECISION AND ORDER

---

Following a trial to a jury and a verdict in favor of the plaintiff, Ameron filed a motion for judgment as a matter of law on the ground that the verdict was not supported by the evidence. Ameron also moves for a new trial on the ground that this court committed some sixteen errors of law during the course of the trial. The motions have been extensively briefed and, for the reasons given below, they will be denied in all but one respect.

## I. MOTION FOR JUDGMENT AS A MATTER OF LAW

Judgment as a matter of law may be entered where "'there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue.'" *Kossman v. Northeast Illinois Reg'l Commuter R.R. Corp.,* 211 F.3d 1031, 1036 (7th Cir. 2000) (quoting Fed. R. Civ. P. 50(a)(1)). The question is "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the

party against whom the motion is directed." *Mack v. Great Dane Trailers,* 308 F.3d 776, 780 (7th Cir. 2002) (citations omitted).


## A. Express Warranty

Ameron first argues, as it did in its motion for summary judgment, that there was no evidence of a specific affirmation of fact or promise by Ameron to Manitowoc "that the coating provided by its product, Amercoat 253, would last for five years if it was properly applied according to Ameron's directions," which the jury found in Question 1 of the amended special verdict. (Docket No. 216.) Because this issue was previously addressed in the court's decision denying Ameron's motion for summary judgment, I will only briefly address it here. It is true that there was no evidence suggesting that any Ameron employee ever said, verbatim, the question asked in the special verdict. Yet the jury heard substantial evidence that Ameron had offered a warranty for five years, that its product was suitable and that it would stand by that product. The jury also was able to conclude that the warranty became part of the basis of the bargain – that is, but for the warranty, Manitowoc would not have entered into the transaction. In addition, Ameron's belief that any warranty given here was merely "inferred" by the jury is off the mark. The jury heard about the negotiations for the warranty that led up to Manitowoc's signing of its contract with VMSI, and it was able to consider the behavior of the parties. In sum, viewing the evidence in Manitowoc's favor, a jury could reasonably find all of the essential elements of an express warranty.


## B. Implied Warranty of Merchantability

Ameron also argues that there was no evidence supporting Manitowoc's claim that the coating was not fit for its ordinary purpose. *See* Wis. Stat. § 402.314(2)(c). On this point, I agree

with Ameron. The ordinary purpose of the Amercoat 253 is cargo tank coating. There is no evidence that Amercoat 253 is not fit for this purpose. The evidence showed that it is successful in preventing cargo tank breakdown due to environmental conditions and IMIA had successfully used the product numerous times. In fact, when the initial coating failed, Manitowoc used the same product to re-coat the cargo tanks. Even now, Manitowoc does not claim that Amercoat 253 is not, generally speaking, a proper cargo tank coating.

Manitowoc argues, however, that all it had to show was that the product failed in *this* instance. But there was no evidence that the particular batch of Amercoat 253 used in the initial coating was somehow contaminated or otherwise defective. The failure in this case was due to the conditions under which the product was applied and/or the manner of application. The issue really came down to whether the application was according to Ameron's instructions set forth in the product data sheet, as modified by Gary Forbes, its on-site representative. In other words, the evidence established that the coating, in order to accomplish its ordinary purpose, had to be applied in a manner and under conditions other than what Ameron authorized in this instance. Whether Ameron, through its representative, authorized the application in this instance is more properly considered (as discussed below) with respect to principles of waiver or misuse. And, though it is generally true that a product that fails when used in accordance with the manufacturer's instructions is unmerchantable, Manitowoc has cited no precedent supporting a finding of unmerchantability when the manufacturer gives instructions in an *ad hoc* fashion and the application of the product is essentially undertaken on a custom basis. I conclude that Forbes' acts or omissions in the single instance at issue here cannot render an otherwise capable product unmerchantable. Ameron's motion to dismiss this claim will therefore be granted.

3

## C. Failure to Conform to Warranty

Ameron also argues that there was no evidence substantiating Manitowoc's claim that the product failed to live up to the warranty. As with its argument contesting the existence of an express warranty, Ameron merely calls into question the facts and testimony presented to the jury and presents the version of events most favorable to its argument. It also did so before the jury, and the jury rejected its position. Much of Ameron's argument is based on the failure of the experts to explain exactly *why* the product failed. Yet even if Ameron's argument were credited, the fact remains that the product *did* fail, and the jury could draw the necessary conclusions from the evidence before them. Thus, viewing the evidence in Manitowoc's favor, a jury could reasonably find that the product failed to live up to the warranty Ameron offered.

## D. Product was Properly Used

Ameron also argues the jury had no evidence to support the conclusion that the coating was properly applied. It focuses exclusively on the third layer of the coating, suggesting that incontrovertible evidence shows that the third layer was not applied properly. Yet there was evidence from which the jury could conclude that the coating was properly applied; moreover, the jury could have concluded that any problems in the third coat would not have caused the problems that the coating ultimately suffered. Additionally, as discussed more fully below, Manitowoc was relying on Ameron's on-site expert to advise about the coating's application. Because Forbes signed off on the application, the jury was able to conclude that the product was used according to the directions provided by the manufacturer. Thus, the jury could reasonably have found that the Amercoat 253 was properly applied.

4

## II. MOTION FOR NEW TRIAL

Ameron has also moved for a new trial under Fed. R. Civ. P. 50(b) and 59(a).

In ruling on a motion for new trial, federal law requires a district court to determine "whether 'the verdict is against the weight of the evidence . . . the damages are excessive, or . . . for other reasons, the trial was not fair to the party moving.' " We will not set aside a jury verdict if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issues of credibility and weight of evidence to the jury.

*Kapelanski v. Johnson,* 390 F.3d 525, 530 (7th Cir. 2004) (citations omitted).

This standard, like the standard governing motions for judgment as a matter of law, reflects the need to defer to the jury's verdict unless the verdict was clearly wrong or the trial was manifestly unfair to the movant. Rules 50 and 59 are not, in other words, an invitation to the losing party to present a list of picayune grievances about the trial court's rulings or various bits of evidence or argument presented to the jury. This is perhaps especially true when a complex commercial dispute is tried to a jury in a two-week trial. If a new trial would be warranted based on any minor error, a case like this – given the complexity of the facts and law as well as the length of the trial – would become caught up in an endless cycle of trials and post-verdict motions, never reaching resolution. With that in mind, I will address each of Ameron's claims of error.

## A. Ambiguous Instructions and Verdict

Ameron first argues that the jury instructions were inherently ambiguous and that the verdict improperly inferred the existence of an express warranty. Ameron suggests that its own proposed verdict would have allowed the jury to draw (or not draw) the requisite conclusions to support an express warranty claim, but in Ameron's view the verdict actually given the jury *assumed* that such a warranty existed.

5

The first five questions of the original special verdict read as follows:

1.      Did Ameron make an express promise to Manitowoc that the coating provided by its product, Amercoat 253, would last for five years if it was properly applied according to Ameron's directions?

2.      If you answered "yes" to Question 1, then answer this question: Was such promise a part of the basis of the bargain upon which Manitowoc decided to purchase the Amercoat 253 at issue in this case from Ameron?

3.      If you answered "yes" to Question 2, then answer this question: Did the Amercoat 253 at issue perform as promised by Ameron?

4.      Is Amercoat 253 reasonably fit for its ordinary purpose as a cargo tank coating?

5.      If you answered "yes" to Question 3 or Question 4, then answer this question: Did IMIA properly apply the Amercoat 253 to the cargo tanks of the barge according to Ameron's directions?

(Docket No. 254.)

Ameron asserts that question 3, for example, improperly assumed that Ameron had made a promise regarding the performance of Amercoat 253.  But question 3 was to be answered only if the jury *did* find, in question 1, that Ameron made a promise "that the coating . . . would last for five years."  Accordingly, the question of whether a promise had been made was left up to the jury rather than simply assumed by any of the jury questions.

Ameron also notes that the verdict gave rise to a question from the jury and suggests that I erred in further instructing the jury that question 3 was meant to discern whether the paint had failed.  Because it was obvious that the paint failed, Ameron asserts, I essentially directed the jury to find against Ameron.  The question, however, speaks for itself: did the Amercoat 253 perform as promised?  This question, as just noted, was to be answered only if the jury had already concluded that Ameron had made an express promise that the coating would last five years if

6

properly applied.  As such, built into the question was the assumption that Ameron had promised that the paint would last for five years (i.e., that it would not fail) if properly applied.  To answer "no" to question 3, therefore, the jury must have concluded that the paint *failed* to perform as Ameron had promised, not merely that the paint had delaminated.  Accordingly, the instruction did not prejudice the outcome; at worst, it was extraneous.

Finally, Ameron suggests the jury was confused about the burden of proof.  Initially, there was some confusion because the jury was incorrectly instructed that the burden of proof lay on the party seeking a "yes" answer to each verdict question.  This was incorrect because plaintiff needed the jury to answer "no" to Questions 3 and 4 in order to prevail on its warranty claims.  Plaintiff's counsel, in reliance upon the instruction, then requested the jury to answer "yes" to all questions (when in fact counsel truly wanted the jury to find "no" on questions 3 and 4).  When the error was discovered, a supplemental instruction was prepared that correctly advised the jury as to which party carried the burden of proof.  (Docket No. 215.)  Unfortunately, the error in the instructions also meant that the instruction for Question 5 in the verdict was in error.  Question 5 of the verdict asked whether IMIA properly applied the Amercoat 253 to the cargo tanks of the barge according to Ameron's instructions.  However, the preface to the question instructed the jury "If you answered "Yes" to Question 3 or Question 4, then answer this question . . . ."  (Docket No. 254.)  This was incorrect because the jury only needed to decide whether the product was properly applied if they first found either that it had failed to perform as promised or was not fit for its ordinary purpose.  Upon discovering this error, the court prepared an amended verdict that properly instructed the jury that they should answer Question 5 only if they answered "No" to either Question 3 or Question 4.  (Docket No. 216.)  The jury was then brought back into the courtroom, and counsel for each party

7

was given five minutes to briefly indicate to the jury how they believed the questions should be answered. The jury then returned to its deliberations and shortly thereafter advised the bailiff that it had reached a verdict.

Although there was undeniably some initial confusion on the burden of proof, I find no indication that the jury was actually confused on the law when it came time to submit its verdict. The process of instructing the jury was not a model of clarity, to be sure, but the supplemental instruction and the amended verdict, combined with the court's instructions and the opportunity for counsel to supplement their closing arguments, cured any errors and properly advised the jury as to the burden of proof. And given the apt questions the jury asked and its swift verdict, it is evident that the jury was far less confused than Ameron suggests. Ultimately, even if I fully credited Ameron's arguments as to the ambiguous jury instructions, I could conclude neither that the verdict was against the weight of the evidence nor that the trial was manifestly unfair to Ameron.

**B. Waiver**

The issue of waiver has borne the brunt of Ameron's post-verdict briefing. The issue arose from the fact that Ameron's representative, Forbes, was present on-site and signed off on IMIA's application of the Ameron 253 coating. Because Ameron claimed that IMIA had failed to apply the coating according to its instructions as a defense to Manitowoc's breach of warranty claims, I concluded the jury should consider not only the instructions contained in the Amercoat 253 product data sheet, but also the actions of Ameron's on-site representative in determining what those instructions were. Thus, the jury was given an instruction entitled "Improper Application and Misuse" (Docket No. 214 at 9-10), was instructed on misuse, and was also instructed that the nature

8

of Ameron's warranty (if any) was conditional on the product being used according to Ameron's specifications and instructions.

In this instruction, the jury was told that Forbes could alter the instructions contained in the product data sheet in either of two ways. First, the jury was instructed that Forbes' actions and statements about proper use of the product could be binding on Ameron.

> [Y]ou should consider the instructions contained in the product data sheet for the Amercoat 253 and the specific instructions, if any, that Ameron's Technical Field Representative, Gary Forbes, gave while on the site. As Ameron's agent, Forbes had authority to act on Ameron's behalf in instructing Manitowoc and IMIA on the proper application of Amercoat 253. To the extent instructions given by Forbes were inconsistent with instructions contained in the product data sheet, Manitowoc and IMIA were entitled to rely on the directions given by Forbes.

(Docket No. 214 at 10.) This instruction essentially allowed the jury to consider what Forbes said as altering the application instructions for the product contained in the product data sheet. In other words, if the instructions expressly given by Forbes were followed, Ameron could not later claim that the product was applied improperly.

In addition to any instructions Forbes made *explicitly*, the jury was also instructed that Forbes' silence could preclude Ameron from pressing its improper application defense:

> [A] party to a contract may waive a condition of the contract made for his benefit by failing to object to a defective performance of that condition of which he has knowledge. To be effective, however, a waiver must be the voluntary and intentional relinquishment of a known right. Contract provisions may be waived expressly or the waiver may be inferred from the conduct of the parties. If the performance under a contract is defective but a party consents to performance with knowledge of the defect and, after full opportunity for examination, that party fails to give timely notice of the defect to the performing party, any objection based on that defect is waived.

> Other than changes authorized or defects in application waived by Forbes, however, Manitowoc and IMIA were required to comply with the application instructions and maintain the environmental conditions set forth in the product data sheet.

(*Id.*)

9

In other words, if Ameron's on-site representative knew that the product was being applied in a manner or under conditions that varied from the directions contained in the product data sheet and nevertheless "consented" to the product's application, Ameron would no longer be entitled to claim the product was being improperly applied.

Ameron argues that this instruction, which it calls the "waiver of strict performance" instruction, was erroneously "engrafted" onto the misuse instruction.[1]  Ameron is correct that "performance"—strict or otherwise—is a concept that does not usually apply to a defense of product misuse or improper applications.  But that does not mean it never applies in a warranty context.  As a Missouri court explained in a case involving a similar claim of express warranty:

> the nature and extent of the warranty depends [sic] upon consideration of the representations or affirmations made by the seller and all the circumstances surrounding the transaction, and it follows that the content of the bulletin and the instructions on the label cannot be ignored in ascertaining the terms of the warranty. One major aspect of the appellant's defense was that whatever representation had been made was dependent upon the plaintiffs' use of the weed killer according to directions, and of course liability on a warranty may be made dependent upon the occurrence or *performance of conditions*, in which case the warranty is usually described as a conditional warranty. *If liability on the warranty is conditional, then either compliance with or waiver of the conditions must be shown by the warrantee before he can recover for its breach.*

*Venie v. South Central Enterprises, Inc.,* 401 S.W.2d 495, 501 (Mo. App. 1966) (emphasis added, citations omitted).

---

[1] Although the court ultimately used some of the language in WIS JI-Civil 3058 entitled "Waiver of Strict Performance" in drafting the instruction on "Improper Application and Misuse," Manitowoc's request for that instruction was denied.  The jury was not instructed that they could find from the evidence that Ameron had waived its right to strict performance of the condition precedent to the alleged warranty.  The phrase "strict performance" does not appear in the instruction.

10

Here, there was evidence that Ameron had given a conditional warranty, i.e., that the coating provided by Amercoat 253 would last five years if the product was properly applied according to Ameron's instructions. In addition, Ameron claimed that the instructions contained in its product data sheet were controlling and any deviation from them voided the warranty Manitowoc claimed existed. In other words, Ameron's warranty was made dependent upon Manitowoc's performance of a condition precedent. The condition precedent was that Manitowoc, or its agent, apply the Amercoat 253 within the environmental parameters set forth in the product data sheet.

There was also evidence, however, that Ameron's on-site representative had not only expressly authorized deviations from the instructions in the product data sheet, but that he had also impliedly authorized them by signing the applicator's log, indicating acceptance of the application, with full knowledge of the deviation. In light of this evidence, I concluded that Manitowoc was entitled to an instruction on the doctrine of waiver as it might apply in this case. In essence, I concluded that Forbes' failure to object to deviations from the instructions in the product data sheet of which he was aware could constitute a waiver of such deficiencies in Manitowoc's performance of the condition precedent to the warranty. While this may not be the way in which performance under a contract is usually considered, I am satisfied it was not misleading to the jury or improper under the circumstances of this case. I therefore reject Ameron's general objection that the concept of performance should not have been before the jury.

But even if the sole paragraph in the instructions discussing contract performance was out of place, that does not necessarily mean it was erroneous to allow the jury to consider the more general concept of waiver. At worst, the brief reference to contractual performance was surplusage. As noted, the genesis of the waiver issue was that Forbes was an authorized representative of

11

Ameron who was present during the use of Ameron's product. The contested jury instruction addressed the question of whether the product was properly applied, a condition precedent to Ameron's five-year warranty and, thus, a defense to the breach of warranty claim. Generally, I concluded that, as Ameron's agent, Forbes could have *changed* application directions for the Amercoat 253 while he was at the site. If he did so, there was no misuse so long as the use was within the scope of what Forbes authorized or approved.

Forbes could have changed the instructions for applying the product in two ways. First, his own words could explicitly instruct IMIA that its application of the Amercoat 253 was acceptable. This is reflected in the first paragraph cited above: "you should consider the instructions contained in the product data sheet for the Amercoat 253 and the specific instructions, if any, that Ameron's Technical Field Representative, Gary Forbes, gave while on the site." Second, Forbes could *implicitly* tell IMIA that its application was acceptable. If he was at the site, observing the coating's application and signing off on it, I concluded that his actions (or inactions) could change the scope of the product's proper (foreseeable) use in the same fashion that his own explicit words could. In other words, Forbes' silence could operate as a waiver of Ameron's ability to later claim the product was not used in accordance with its explicit written instructions. Thus, the jury was instructed that the proper use of the Amercoat 253 was governed by the uses set forth in the instructions and data sheet, as well as changes or defects in application authorized or waived by Forbes: "Other than changes authorized or defects in application waived by Forbes, however, Manitowoc and IMIA were required to comply with the application instructions and maintain the environmental conditions set forth in the product data sheet." (Docket No. 214 at 10.)

12

Given this instruction, the jury could have reached a number of conclusions. First, it could have found that Forbes did *not* voluntarily and intentionally relinquish the warranty's condition that the Amercoat 253 be applied as set forth in its instructions and product data sheet. That is, the jury could have concluded that whatever Forbes said or failed to say, did not constitute a waiver. In that case, it could also have found that the application of the Amercoat 253 was not in accordance with Ameron's instructions, which would have been a failure of the condition precedent to the warranty, and Ameron would have been entitled to a verdict in its favor. Alternatively, the jury could have concluded that perhaps Forbes did alter the application instructions – either explicitly or through waiver – but that the plaintiffs' use of the product went beyond the use he authorized.

In either case, the jury did have the opportunity to find in Ameron's favor, and Ameron's defense to Manitowoc's express warranty claim was not "eviscerated" in the fashion it now claims. The central question the jury had to answer was: Was the product applied according to the directions of the manufacturer? The jury answered "yes." Thus, the improper application defense was always on the table, but the jury was allowed to conclude that Forbes had modified the original applications instructions. I therefore conclude that Ameron's defense was properly before the jury and that any error in the waiver instruction did not affect the result.

Ultimately, despite extensive briefing, Ameron has not identified a single principle of law or equity that would allow a company to claim misuse of a product as a defense to a warranty when a jury finds that its own agent authorized that use. That is what happened here. Even if I erred in instructing the jury on waiver, I conclude that the jury would have reached the same result under Ameron's proximate cause theory. Either Ameron waived a condition of the warranty, or it knew of, and approved, a specific use of the product. Either way, its misuse defense failed.

13

## C. Causation

Ameron also asserts that I erred in failing to give an instruction on causation or otherwise require the jury to find that IMIA's application might have caused the damage that occurred. This is incorrect. The jury instructions alerted the jury that damages could be awarded only for losses that were the consequence of Ameron's breach. "In determining the damages, if any, you will award an amount that will reasonably compensate the injured person for all losses that are the natural and probable consequence of the breach. In other words, if you find that the repair of the barge was necessitated by Ameron's breach of warranty of its product, you should award Manitowoc the reasonable cost of the repair." (Docket No. 214 at 11.) Ameron was free to argue that its product would have lasted were it not for other causes, but the jury rejected this argument in finding that Ameron's breach "necessitated" the repair of the barge.

## D. Evidentiary Matters

In addition to the alleged errors relating to the jury instructions and verdict, Ameron asserts what amounts to a laundry list of various evidentiary and other errors that occurred during the course of the trial. I will address these briefly. First, Ameron claims the plaintiff should not have been allowed to introduce evidence or argument that Ameron's product data sheet should have included additional information regarding amine blush , induction times or special precautions for cold-weather applications. Along the same lines, Ameron challenges the admission of a seasonal advisory bulletin containing such information that it issued subsequent to the failure in this case. Ameron's contention seems to be that allowing such evidence transformed the case into one involving negligence rather than warranty. Although I initially agreed with Ameron and ruled *in*

14

*limine* that the seasonal bulletin was irrelevant to the existence and breach of a warranty, I later concluded that Ameron had opened the door to such evidence by presenting testimony that its application instructions were adequate and had not changed. Once Ameron's witness testified on redirect that no changes had been made in the instructions contained in the product data sheet, I concluded that Ameron had opened the door to discussion of the seasonal advisory bulletin. Ameron is correct that the ultimate issue is not one of negligence, i.e., what *could* or *should* have been included in the data sheet. But it does not follow that any inquiry into what the bulletin actually said was barred simply because this was not a negligence case. Given the witness's testimony suggesting that the product data sheet was sufficient as-is, I concluded that the bulletin—which contained additional information about cold weather applications—now possessed relevance it otherwise lacked—i.e., that the door had been opened. Moreover, Ameron cannot show that the jury's verdict—which involved questions solely about breach of warranties—was affected by the allegedly improper evidence suggestive of negligence.

Ameron also argues that it was error to allow reference to an unrelated written warranty between Ameron and Halter, the contractor on an earlier VMSI barge. But the previous warranty was not unrelated. The evidence suggested that when Manitowoc wrote Ameron and asked for a copy of the warranty Ameron was extending to it, Ameron responded by sending a copy of the written warranty it had given Halter. I therefore concluded that the Halter warranty was relevant to the question of whether Ameron gave an express warranty to Manitowoc. The admission of this evidence did not confuse the jury, since it was clear that Manitowoc was not a party to the previous warranty and that it involved an earlier project.

Ameron further argues that I erred in precluding it from introducing evidence of a prior settlement agreement between Manitowoc and IMIA. Essentially, Ameron wanted to argue that

15

Manitowoc failed to reasonably mitigate its damages when it agreed to rescind the settlement agreement between itself and IMIA. The court's ruling, Ameron argues, prevented it from offering damage mitigation evidence.

This issue was fully addressed prior to trial. I noted at that time that Manitowoc can hardly be accused of failing to mitigate its damages because it rescinded or reformed an agreement by which it had inadvertently eliminated from its damage claim the $1.3 million that it owed IMIA for the re-coating work and obligated itself to pay IMIA sixty-five percent of any remaining recovery it did receive. The real issue concerning the initial settlement agreement between Manitowoc and IMIA is whether the court erred in granting Manitowoc's motion to reconsider its previous ruling granting Ameron partial summary judgment on the basis of the reformed agreement. In any event, I am satisfied that it was not error to exclude this evidence at trial. It is not relevant to mitigation and would only have confused the jury.

Ameron also argues that I should have instructed the jury on partial apportionment of damages. It claims it should have been able to separate damages resulting from misuse from damages resulting from breach of warranty. But as Ameron correctly notes in other arguments it makes, this was a contract action over an alleged breach of warranty, not a tort action to determine comparative fault. Either the product was misused, meaning not applied according to Ameron's instructions—in which case the warranty did not exist—or it was properly applied. There was no in-between. Ameron cites no precedent for the proposition that damages resulting from a breach of warranty can be apportioned in such a fashion, or that misuse or failure of a condition precedent could serve as only a partial defense to a breach of warranty claim.

This is not to say that the defense of product misuse can never serve as a basis for apportioning damages. In product liability actions, for example, the "failure to use the product for

16

its intended purpose," or "the abuse or alteration of the product" are forms of contributory negligence that can justify the apportionment of damages awarded for personal injury. *See* WIS JI-Civil 3200 Products Liability: Law Note For Trial Judges, at 6 (2002) (citing Restatement Second Torts § 402A, commt. n). But a product liability claim sounds in tort, not contract. Plaintiff has cited no case that supports the extension of such a rule to traditional breach-of-warranty cases seeking damages for economic loss, and leading commentators doubt its wisdom: "[W]e have some doubt about the wisdom of applying comparative fault and particularly about the wisdom of extending it to conventional cases of economic loss." James White & Robert Summers, *Uniform Commercial Code,* § 11-8, at 412 (4th ed. 1995). Absent any Wisconsin precedent for doing so, I find no error in failing to submit an apportionment question to the jury.

### E. Equitable Cross-claims

Ameron also argues that I erred in dismissing, on my own initiative, its cross-claims against IMIA. It urges that it should have been allowed to pursue a theory of equitable contribution against IMIA for IMIA's improper application of the product. It is unfair, Ameron posits, that it should bear 100% of the burden for what is essentially a common debt.

There is no common debt in this case, however. Equitable contribution may be available when (as in the case Ameron cites) a single debt is borne unequally by two equally indebted individuals.

> A right to contribution may be based on an express contract between the parties. It may also arise by operation of law to rectify an inequity resulting when a co-obligor pays more than a fair share of a common obligation. In the latter instance, the contract is implied by law. When no express agreement confers a right of contribution, a party's right to seek contribution against another is premised on two

17

conditions: (1) the parties must be liable for the same obligation; and (2) the party seeking contribution must have paid more than a fair share of the obligation.

*Kafka v. Pope,* 533 N.W.2d 491, 494 (Wis. 1995). Here, however, any obligation arising on the part of IMIA would be due to IMIA's own, separate, behavior – i.e., misapplying the coating. Moreover, if the jury had found that IMIA had improperly applied the coating, then Ameron would not have been liable. Ameron's liability under the warranty was conditioned upon its product being properly applied. There is thus no commonality in the obligation to Manitowoc, and the two parties cannot therefore be said to share the "same obligation." *Id.* The potential liability of IMIA and Ameron stemmed from completely different obligations, which means they are in no sense "co-obligors." Accordingly, I find no error in the dismissal of Ameron's cross-claims.

## F. Manitowoc's Claim for Cost of Paint

Ameron next claims that the court erred in allowing Manitowoc to belatedly assert a claim for the cost of the paint used in the initial coating of the cargo tanks when it failed to introduce any evidence of such damages during trial. Not only was it error to allow Manitowoc to assert the claim, Ameron argues, but the court compounded the error when it allowed Manitowoc to raise the issue, over Ameron's objection, for the first time in its rebuttal closing argument to the jury.

Ameron is mistaken regarding the item of damages that Manitowoc belatedly asserted. It was not the cost of the paint used on the initial coating, but rather the cost of the replacement coating that Manitowoc asked the jury to award. Ameron had asserted a counterclaim against Manitowoc in which it alleged that Manitowoc still owed it $161,035.85 for the paint it ordered for the re-coating work done after the initial application failed. To prove its claim, Ameron introduced

18

as evidence copies of the unpaid invoices it had sent Manitowoc in response to Manitowoc's purchase order for the paint. Since this evidence was uncontested and there was no evidence that the second coating had failed, I concluded that Ameron was entitled to judgment as a matter of law on its counterclaim and granted a motion to that effect. Manitowoc then indicated an intent to request, as part of its damages for the cost of repair, the amount that I had just awarded to Ameron. Ameron objected on the ground that Manitowoc had not introduced any evidence in support of such damages in its case in chief. However, the court noted that Ameron had itself introduced the evidence in the form of the invoices used to prove its counterclaim. Manitowoc was entitled to seek the cost of the paint supplied by Ameron, no less than the cost of the labor supplied by IMIA, as part of its damages for the breach of warranty it had alleged. Ameron's objection was therefore overruled. Ameron offers no argument in support of its motion for a new trial that warrants revisiting that ruling.

Ameron is correct that Manitowoc did not mention this element of damages to the jury until its rebuttal argument. In fact, surprisingly, Manitowoc's attorney did not address damages at all during his initial closing argument, and based on the closing argument given by Ameron's attorney, who likewise left virtually untouched the issue of damages, the court had counsel approach the bench before counsel for Manitowoc began his rebuttal and inquired at sidebar whether counsel intended to argue damages in his rebuttal argument. When he stated he did and counsel for Ameron indicated his intent to object, the court excused the jury to address the issue outside its presence. After considering the arguments of counsel, the court agreed with Ameron that because Manitowoc had failed to address damages in its initial closing argument and in light of the fact that Ameron had not addressed damages in its closing, it would be improper to allow Manitowoc to raise the issue

19

for the first time on rebuttal and leave Ameron no opportunity to respond. Recognizing that under the circumstances it could rule that Manitowoc's counsel could not address damages at all, the court instead elected to allow counsel to argue damages to the jury and grant counsel for Ameron a sur-rebuttal argument to address any issue counsel for Manitowoc raised for the first time in his rebuttal. In deciding to address the issue in this way, the court concluded that it could prevent any unfair prejudice to Ameron, while at the same time allow the jury to hear a full and complete presentation of the case.[2] Counsel for Ameron, for what the court can only conclude were reasons of strategy, elected not to take advantage of the court's offer and declined to present further argument to the jury. But that was his choice. Ameron cannot claim it was denied the opportunity to respond. I therefore reject this claim of error as well.

### G. Improper Argument

Ameron argues that a new trial should be granted on the ground that counsel for Manitowoc improperly argued in his closing that the jury should send a message to Ameron. Ameron immediately objected, and the court sustained the objection. No request was made at the time for a curative instruction.

The Seventh Circuit has "repeatedly recognized that 'improper comments during closing argument rarely rise to the level of reversible error.'" *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 730

---

[2]This ruling, like others, such as the ruling on Manitowoc's motion to reconsider the court's decision partially granting Ameron's motion for summary judgment, finds support in the general prescription that the rules governing procedure in the United States district courts "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. These rulings were also intended to avoid multiplying the number of lawsuits necessary to resolve the underlying claim.

20

(7th Cir. 1999) (quoting *Probus v. K-Mart, Inc.*, 794 F.2d 1207, 1210 (7th Cir. 1986)). To warrant a new trial, "[s]tatements made during closing argument must be plainly unwarranted and clearly injurious to constitute reversible error." *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 644 (7th Cir. 1995); *see also Arcor, Inc. v. Textron, Inc.*, 960 F.2d 710, 713 (7th Cir. 1992) ("Improper statements during closing arguments warrant reversal only if they 'influenced the jury in such a way that substantial prejudice resulted to' the opposing party." (quoting *Fenolio v. Smith*, 802 F.2d 256, 258 (7th Cir. 1986))).

Although I agree with Ameron that counsel's argument was improper, it was not so injurious or prejudicial as to warrant a new trial, especially in view of the fact that counsel's objection was immediately sustained. A new trial is warranted only if allegedly improper closing remarks influenced the jury in such a way that substantial prejudice resulted to the opposing party. *See Marshall v. Porter County Plan Com'n*, 32 F.3d 1215, 1221-22 (7th Cir. 1994). I find no such prejudice here. Counsel's "message-sending" argument was cut off immediately. Viewed in the context of the entire trial, I am satisfied that it did not result in prejudice to Ameron. Accordingly, Ameron is not entitled to a new trial on this ground either.

## H. The Interests of Justice

Finally, Ameron asserts that even if no single factor would justify the granting of a new trial, I should nevertheless take a *gestalt* view of the various errors alleged and grant a new trial in the interests of justice. But because I have concluded that there were no errors prejudicial to Ameron's case, it makes no difference whether the alleged errors are viewed individually or as a group. Moreover, I am not persuaded by Ameron's most general protest, which is that the trial was

conducted as if it were a tort, rather than warranty, case. To the extent information was presented to the jury suggesting what Ameron may have known about its product—i.e., evidence suggestive of possible negligence—that evidence is at least marginally relevant when the defendant defends the case on the basis that its product was not defective. In addition, the jury instructions clearly instructed the jury only as to the issues relevant to warranty, and the verdict reflects that the jury found Ameron had made, and breached, an express warranty it made to Manitowoc.

The court also concludes that Ameron vastly overstates the issue of jury confusion. As I conceded earlier, the verdict was not a model of clarity and there were errors in both the initial verdict and instructions. But the errors were cured, and what became clear was that the jury was *not* confused—it seemed to know exactly what outcome it believed was justified, but it was unable to reach that outcome due to the errors on the verdict form. It promptly and intelligently brought those errors to the court's attention, and an amended verdict, and new instructions, were given. This demonstrates that the jury was not confused, but rather carefully considered the verdict and instructions before arriving at its verdict. Accordingly, I am satisfied that no prejudice occurred.[3]

## III. PREJUDGMENT INTEREST

Manitowoc also seeks pre-verdict interest in the amount of $304,471.69. Ameron opposes Manitowoc's request. "Prejudgment interest may be awarded only if the amount of damages is

---

[3]Ameron also argues (section H of its initial brief) that the court erred in precluding it from presenting evidence that it had disclaimed any UCC implied warranties. This issue was likewise addressed in the court's decision denying Ameron's motion for summary judgment, in which the court held as a matter of law that Ameron's disclaimers were ineffective under the circumstances of this case. In addition to the reasons previously set forth on the record, I further note that because I have concluded that there was no breach of any implied warranties, this issue is now moot.

ascertainable or determinable prior to judicial determination, i.e., where there is a reasonably certain standard of measurement[, by which] when correctly applied[,] one can ascertain the amount owed." *Klug & Smith Co. v. Sommer,* 265 N.W.2d 269, 272 (Wis. 1978).

Ameron protests the award of prejudgment interest largely on the ground that its liability was either contested or that liability might be shared. But nowhere does Ameron meaningfully contest the calculation of the damages the jury awarded or suggest that the amount awarded—$1,780,964.15, after offsetting the amount awarded Ameron on its counterclaim—was not essentially ascertainable at the outset of this lawsuit. Indeed, as Manitowoc points out, the damages awarded by the jury actually reflect the damages Manitowoc demanded in May 2003. Moreover, neither did Ameron meaningfully contest the *amount* of the damages during the trial, which suggests that the amount Manitowoc calculated was not in dispute. "Where the record shows no more than putting the plaintiff to his proof, prejudgment interest is appropriate, while a substantial variance between the amount prayed for and the amount recovered is indicative of a genuine controversy and an unascertainable amount owed." *Id.* Here, I conclude that the amount of damages was, and remained, largely uncontested and was ascertainable at the outset of this case. Accordingly, prejudgment interest will be awarded in accordance with my original order for judgment.

## IV. CONCLUSION

For the reasons stated above, Ameron's motion for a new trial is **DENIED**. Ameron's motion for judgment as a matter of law is **DENIED**, except that the motion is **GRANTED** with respect to the claim for implied warranty of merchantability. The clerk is hereby directed to enter

a second amended judgment in favor of Manitowoc Marine Group, L.L.C., and against Ameron International Corporation awarding Manitowoc damages in the amount $1,780,964.15 ($1,942,000 less $161,035.85 awarded Ameron on its counterclaim), together with pre-verdict interest in the amount of $304,471.69, for a total judgment of $2,085,435.84, together with interest from the date of verdict at the legal rate of 12%.

  **SO ORDERED** this  18th  day of January, 2007.

        s/ William C. Griesbach
        William C. Griesbach
        United States District Judge